[Cite as *Qaqa v. Cintron*, 2024-Ohio-2970.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| TAREQ QAQA, | : | CASE NO. CA2023-07-055 |
| Appellee, | : |  |
|  | : | O P I N I O N<br>8/5/2024 |
| - vs - | : |  |
|  | : |  |
| YANESHKA CINTRON, | : |  |
| Appellant. | : |  |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. 21DR43094

Kirkland & Sommers, Co., LPA, and Craig M. Sams, for appellant.

**BYRNE, J.**

{¶ 1} Mother appeals from a shared parenting decision of the Warren County Court of Common Pleas, Domestic Relations Division. Mother and Father resided in Warren County, Ohio, where they raised two young children. Without Father's knowledge or permission, Mother took the children to her parents' home in Illinois and began living there with the children. Father thereafter filed for divorce and shared parenting in Warren County, Ohio. After a final hearing, the court designated the City of Springboro, Ohio as

the children's school district, effectively requiring the children to be returned to Ohio. In this appeal, Mother contends that the domestic relations court abused its discretion by ordering the children returned to Ohio. For the reasons set forth below, we affirm the domestic relation court's decision.

## I. Factual and Procedural Background

### A. The Marriage and Events Leading up to the Divorce Filing

{¶ 2} Father and Mother met on an online dating app. At the time, Father was a resident of Dayton, Ohio, and Mother was a resident of Chicago, Illinois. In 2016, the parties married. During the marriage, Mother and Father lived in Ohio. They first lived in Miamisburg, Montgomery County, Ohio. Later, they moved to Springboro, Warren County, Ohio. Mother and Father welcomed their first child, "Son," in July 2018. In December 2020, the couple welcomed their second child, "Daughter."[1]

{¶ 3} By November 2021, the marriage was failing. Mother was displeased with various aspects of Father's behavior, including his verbal disrespect towards her, his complaining about the tidiness of the marital home, and his alleged habit of leaving the house after the children went to bed to spend the night out with friends.

{¶ 4} On November 16, 2021, Mother went to the Springboro police department and sought police permission to leave with the children and go to Chicago. The police informed Mother that they could not grant her permission to leave with the children. They told her to seek legal advice. Mother did not seek legal advice. Instead, she left Ohio and traveled to Chicago with the children.

{¶ 5} On November 20, 2021, Father filed for divorce in Warren County. On November 22, 2021, Mother requested an emergency order of protection from a court in

---

1. We use descriptive terms to refer to the minors in this case. *See The Supreme Court of Ohio Writing Manual*, § 16, at 115 (3d Ed. 2024).

Cook County, Illinois. In her petition, Mother asked for protection from Father on behalf of herself, Son, and Daughter. The Illinois court granted Mother a protection order, ex parte.

{¶ 6} Meanwhile, Father moved the Warren County domestic relations court for an emergency order designating him as the children's residential parent and ordering the children returned to Ohio. The Warren County domestic relations court found that under the circumstances, there was no current emergency that would require Mother to return with the children to Ohio and thus the court denied Father's request for an emergency order. The court issued temporary orders designating Mother the residential parent and granting Father parenting time with the children via video conferencing.

{¶ 7} Father moved the Warren County domestic relations court to establish a shared parenting schedule while the divorce was pending. However, due to the existence of the Illinois court's protection order, the court held Father's request in abeyance.

{¶ 8} In March 2022, the Warren County domestic relations court issued an entry noting that the Illinois court's protection order was expected to be terminated and that after the order terminated, Father would have in-person parenting time with the children every other weekend and ordered the parties to exchange the children at an agreed midway point between Illinois and Ohio.

{¶ 9} While the divorce was pending, the children remained living with Mother in Chicago, spending every other weekend with Father in Ohio.

## B. The Guardian Ad Litem's Report

{¶ 10} The court appointed a guardian ad litem ("GAL") to investigate and make a recommendation as to the children's best interest. The GAL issued a written report prior to the final contested hearing.

{¶ 11} The report began with the GAL's observations of both parents with the

children. The GAL observed Father and the children together during Father's parenting time weekend. According to the GAL, both children interacted with Father in a positive manner. The GAL had no concerns with Father's home. Son did not want to return to Chicago and verbally expressed that to the GAL. The GAL also observed Mother parenting the children via Zoom. The GAL observed that the children interacted well with Mother and the GAL had no concerns with Mother's home in Chicago.

{¶ 12} The GAL interviewed Mother and reported that Mother stated that she "fled" the state of Ohio because Father was verbally threatening her, and that Father had made some "interesting threats" (Mother's words) to her and the children. She told the GAL that Father stated that he would burn the house down with her in it.

{¶ 13} Mother told the GAL that she decided "she just couldn't do it anymore" the day after an argument with Father. She said that Father was never home and was never involved with the children. She did not believe he would change. She went to the police station and then had her sister come and get her and take her to Chicago. Mother stated that she obtained the civil protection order in Illinois but later dismissed it because the children were not "protected." She told the GAL that she did not want to be protected, either.

{¶ 14} Mother also told the GAL that she did not want to take the children away from Father and that her desired outcome was that they would remain under her care while also visiting with Father. She wanted to continue the then-existing parenting schedule in which the children resided with her in Chicago and spent every other weekend with Father in Ohio.

{¶ 15} When the GAL asked Mother to list Father's strengths on a written questionnaire, Mother listed "attentive (now so more)," "caring," and "loving." When the questionnaire asked Mother to list any concerns with Father, Mother left the section blank.

However, she verbally reported that she was concerned that Father would take the children out of the country.

{¶ 16} The GAL interviewed Father. Father reported to the GAL that Mother relocated to Chicago with the children following an argument. He stated that he and Mother had lived in Ohio for seven years prior to her leaving, and that he earned a living in Ohio and had family in Ohio. Father said there was never a discussion about relocating to Chicago and he was very upset that Mother left and took the children.

{¶ 17} After Mother filed for the civil protection order in Illinois, Father had to retain an attorney in Chicago. Father told the GAL that the Illinois court's civil protection order was in place for one month but Mother requested it remain in place for two years. Mother ultimately dismissed the protection order, but that took time, and Father claimed that Mother provided three different versions of her story in support of the protection order. According to Father, Mother lied to police in Ohio, and then lied in two different Illinois civil protection order filings.

{¶ 18} Father denied ever hitting or threatening Mother and said if they argued, he would leave because he did not want things to escalate. Father stated that Mother visited Chicago five or more times a year, and so if he was threatening her, she would not have come back to Ohio after those many visits.

{¶ 19} Father told the GAL that he did not believe the children were happy in Chicago. He was also concerned about their living arrangements. He sent the children some toys and Mother stated that they did not have room for the toys and sent them back. Father wanted the children back with him in Ohio and did not believe that it was best for them to stay in Chicago.

{¶ 20} When asked on a questionnaire to list Mother's biggest strengths as a parent, Father stated "Her love to her children." When asked for concerns, Father wrote

that he had concerns over Mother's attentiveness to Daughter's health. He explained that Daughter had previously been sick and he asked Mother to take her to the hospital, but Mother waited two months to take Daughter to the hospital. At that time, it was discovered that Daughter might have asthma. Father stated that Daughter got sick again, and when he asked Mother if she took her to the doctor, she replied that it was not that serious.

{¶ 21} The GAL discussed in her report the various statutory best interest factors as they related to the children's care. In the GAL's view, none of the factors weighed heavily in favor of or against Mother or Father.

{¶ 22} Ultimately, the GAL recommended that the court order shared parenting. The GAL noted that relocation cases are difficult, especially on the children, because they suffer due to their parents being located in different states. The GAL observed that the children had previously been living with both parents in Ohio, but now they were not.

{¶ 23} The GAL stated that she did not agree with the way Mother left with the children and went to Chicago. She did not feel that the Illinois civil protection order was an excuse to allow Mother to move the children to Illinois.

{¶ 24} The GAL believed that equal parenting would be most appropriate but noted that this would not be easy on the children if Mother were to remain in Illinois with Father located in Ohio. Ideally, the GAL believed that it would be in the children's best interest if Mother relocated back to Ohio with the children as soon as possible but at least before they are school age.

{¶ 25} The GAL recommended 50/50 parenting once school began, provided that Mother had relocated to Ohio by that time, so long as the parents' respective work schedules permitted. If Mother decided to remain in Chicago, then the GAL recommended designating Father as the residential parent for school purposes.

**C. The Final Contested Hearing**

{¶ 26} The court held a final contested hearing on Father's motion in January 2023. We will summarize the key testimony below.

### 1. Father's Testimony

{¶ 27} Father testified that prior to Mother leaving with the children, she had told him that she did not want to live in Ohio anymore. He told her that she could leave but to let him know so that he could arrange for a babysitter for the kids. She indicated to him that she was not okay with that plan.

{¶ 28} Mother left with the children on November 16, 2021. Father tried calling her that day but Mother had cancelled her phone number. He learned from police that Mother had taken the children to Chicago.

{¶ 29} With regard to the protection order, Father stated that he had never threatened or physically abused Mother.

{¶ 30} Father testified that he worked for a wireless phone company and earned gross wages of approximately $64,000 in 2022. Father testified that he wanted the court to order shared parenting with Mother and also that he wanted Mother to move back to Ohio. He was willing to assist her in finding an apartment in the Springboro area and was also willing to assist her financially with regard to relocation costs.

{¶ 31} Father testified about his positive relationship with the children and the things he would do with them when he was not working. He mentioned taking the children to Chuck E. Cheese. Father also elicited testimony from several family members. In general, those family members had favorable views of both Father's and Mother's abilities as parents.

### 2. Mother's Testimony

{¶ 32} Mother testified that Father worked six days a week from 9:00 a.m. to 7:30 or 8:00 p.m. After Daughter was born, she was a stay-at-home mom and did not work.

Mother testified that she was the primary parent to take care of the children, give them baths, and take them to the doctor. She claimed that after Father got home and the children went to bed, he would leave and go hang out with his friends. She claimed that this happened "almost every night."[2]

{¶ 33} Mother complained that due to Father's culture, she was not allowed to wear makeup, show her ankles, or show any cleavage. She testified that in a text message, Father warned her that people in his culture kill anyone who "try to be around our women."

{¶ 34} Mother stated that she had asked the Springboro police for permission to take the children to Chicago but they had not given it to her. As to the reason she took the children to Chicago, she explained that she was trying to find her "happy place" and that her "happy place" was Chicago.

{¶ 35} Mother agreed that she left with the children on November 16, 2021 and several days later filed for the civil protection order in Illinois. She explained that she filed it "for my safety and the kids." However, she admitted that Father had never physically harmed either her or the kids and that Father loved the children and they loved him. She stated that Father was verbally abusive to her and that one time he had struck a door in their home. Mother stated that she dismissed the Illinois protection order because the children were going to see Father every other weekend and she did not feel she needed to be protected by the order.

{¶ 36} Mother testified that by the time of the final hearing, she and the children had lived for over a year at her parents' home in Chicago, where they were doing well and had a lot of interaction with her family. The children's daycare in Chicago was free. Mother had found a job working as an event planner and she was making $50,000 a year.

---

2. On rebuttal, Father denied going out "every night" with his friends but admitted that he would go out one night a week, on the weekends.

She got the job because one of her sisters worked at the same place of employment. She did not believe that she could find similar employment in Ohio because she lacked connections there and had no college degree.

### D. The Domestic Relations Court's Request for Information

{¶ 37} Following the final hearing, the court requested that the parties file additional information about the financial feasibility of three options: (1) Mother relocating to Ohio, (2) Father relocating to Chicago, and (3) Mother and Father both remaining where they were. The court specifically requested information on expected rental rates in the two locations as well as job prospects in the two locations for both parents. In general, the court was seeking information on how the parties would anticipate paying monthly expenses depending on how the court ruled on shared parenting.

{¶ 38} In his response, Father proposed paying $750 to Mother in rental assistance if she and the children returned to Ohio. Father proposed alternative living plans. In the first plan, the children would remain at the Ohio marital home at all times and the parent who was not then parenting would live at a second apartment. In the second plan, Mother would obtain her own nearby apartment, and Father included information on expected rental rates from five different apartment complexes. In the third plan, Mother and the children would live full time at the Ohio marital home, and Father would pay $750 towards the $1,230 rental costs.

{¶ 39} Father listed several job opportunities in Ohio that he believed Mother would qualify for, for which he believed that Mother could potentially earn between $2,123 and $3,766 per month. Father believed that Mother's total expenses would be approximately $2,720 per month.

{¶ 40} As to daycare, Father stated that he believed that Mother was currently receiving federally funded financial assistance to receive free childcare services through

the State of Illinois. Father believed that these same benefits would be available through the Ohio Department of Job and Family Services. Father identified three local daycares that accepted such public funding.

{¶ 41} Father stated that if the children were permitted to remain in Illinois, he would need to remain in Ohio. He believed with the higher rental rates in the Illinois area, he would need to earn considerably more than he could earn if he moved to Illinois.

{¶ 42} Under Mother's proposed financial plan, Mother believed that Father's employment was easily transferrable to the Chicago area and that he could earn in the range of $23 to $25 an hour (around $48,000 per year) in a managerial position. Mother proposed several neighborhoods where Father could obtain an apartment, ranging from $917 per month to $1,895 per month. Mother estimated that Father would have at least $1,400 in additional monthly expenses for utilities, groceries, etc. if he moved to the Chicago area.

### E. The Domestic Relations Court's Decision

{¶ 43} The domestic relations court issued a lengthy decision in May 2023. After discussing the trial testimony and exhibits, as well as the post-trial filings, the court reviewed the various best interest factors relevant to parental rights and responsibilities and shared parenting. Upon a review of those factors, the court determined that none clearly weighed in favor of or against the children remaining in Illinois or the children returning to their home in Ohio.

{¶ 44} Ultimately, the court determined that it would designate Springboro, Ohio as the children's school district and that any parent who resided in the school district would be a residential parent for school purposes. In explaining its decision, the court stated the following:

This court regards three things of utmost importance in its

handling of cases: 1) the safety of all persons involved, 2) the best interests of children, and 3) fairness.

In this case, the Court understands Mother's need when this case started in 2021 to obtain a DVCPO for herself against Father. Had she filed for a DVCPO here in Warren County, she likely would have received it, and been granted the exclusive use of the marital residence in Springboro. Thereafter, regardless of who filed for divorce, she would have been awarded financial assistance to pay her expenses and care for the children and Father would have been afforded parenting time. Later, after all the evidence was presented, the Court would rule on Mother's request to move with the children to Chicago.

However, Mother filed for a DVCPO immediately in Chicago, and only then for the benefit of the children, not her. When she realized she would not get a DVCPO for the benefit of the children, her action was dismissed. Thus, the initial delay in this Court's ability to address matters for the children was created by Mother utilizing a legal tactic that ultimately was not successful.

Accordingly, though the Court is very much aware that the children are doing well in Chicago, the Court is now being asked to decide whether Mother should have ever had the opportunity to take them there in the first place. After consideration of the exhibits, testimony, and recommendation of the Guardian ad Litem, the Court determines the answer is no. But for unilaterally taking the children to Chicago, Mother would have never had the opportunity to take them there.

When the parents began dating, Mother moved from Chicago to the Dayton area to be with him. When they married, the parents continued to live in the Dayton/Springboro area. Moreover, when they started having children, they also remained in Ohio. Accordingly, now that the parents are divorcing, the Court finds it is in the best interest of the children to remain in the Dayton/Springboro area.

{¶ 45} The court went on to note that Mother had been the primary caregiver of the children while Father was the sole financial provider. The court found that Mother had provided and continued to provide excellent care for the children. Accordingly, while the court found it in the children's best interest to live in Ohio, the court also found that it was in the children's best interest to be cared for primarily by Mother.

- 11 -

{¶ 46} With regard to financial assistance, the court ordered that if Mother moved back to the Springboro, Ohio area, Father would be required to pay her $2,000 per month in support and that Father would also bear the initial financial burden relating to moving back to Ohio. The court retained jurisdiction to review this financial order.

{¶ 47} The court also reviewed the financial feasibility of Mother remaining in Chicago or the children living in Chicago, but found those circumstances were not in the children's best interest.

{¶ 48} In June 2023, the domestic relations court issued a final decree of shared parenting and a shared parenting plan. The shared parenting plan reiterated that the children were to attend Springboro schools.

{¶ 49} Mother appealed, raising one assignment of error. Notably, Father did not file a brief and has otherwise not participated in this appeal.

## II. Law and Analysis

{¶ 50} Mother's sole assignment of error states:

> THE TRIAL COURT ERRED WHEN IT ORDERED MOTHER
> TO MOVE BACK TO OHIO.

{¶ 51} Mother argues that the best interest factors set forth in R.C. 3109.04(F)(1) "clearly weigh in favor of Mother remaining in Chicago with the children." Mother contends that the domestic relations court's decision was not based on the children's best interest, but instead, "A large part of the trial court's decision is based on the trial court not agreeing with Mother's handling of the situation and avoiding setting a negative precedent, [and] the trial court stated as much during the final hearing. T .p. 232."

{¶ 52} Before proceeding with our analysis, we note that, despite the phrasing of Mother's assignment of error, the domestic relations court did not order Mother to "move back to Ohio." The court's order concerned the children, not Mother.

**A. Applicable Law and Standard of Review**

{¶ 53} R.C. 3109.04 governs the award of parental rights and responsibilities. *Chaney v. Chaney*, 2022-Ohio-1442, ¶ 36 (12th Dist.), citing *Lykins v. Lykins*, 2018-Ohio-2144, ¶ 21 (12th Dist.) In deciding parental rights and responsibilities under R.C. 3109.04, the primary consideration is the best interest of the children. *Id.*, citing *Albrecht v. Albrecht*, 2015-Ohio-4916, ¶ 22 (12th Dist.); *accord* R.C. 3109.04(B)(1). To determine what is in the best interest of the children, R.C. 3109.04(F)(1) requires the trial court to consider "all relevant factors." R.C. 3109.04(F)(1); *Albrecht* at ¶ 22. These factors include, but are not limited to, (1) the wishes of the parents; (2) the child's interaction and interrelationship with his parents, siblings, and other persons who may significantly affect the child's best interest; (3) the child's adjustment to home, school, and community; (4) the mental and physical health of all persons involved; and (5) the likelihood that the caregiver would honor and facilitate visitation and parenting time. R.C. 3109.04(F)(1); *accord Chaney* at ¶ 36.

{¶ 54} "When determining whether shared parenting is in a child's best interest, the trial court must consider the additional factors set forth in R.C. 3109.04(F)(2)." *Chaney* at ¶ 37. These factors are (1) the ability of the parents to cooperate and make decisions jointly, with respect to the child; (2) the ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent; (3) any history or potential for abuse; (4) the geographic proximity of the parents to one another; (5) and the recommendation of the guardian ad litem, if the child has a guardian ad litem. R.C. 3109.04(F)(2)(a) thru (e). "While no factor in R.C. 3109.04(F)(2) is dispositive, effective communication and cooperation between the parties is paramount in successful shared parenting." *Seng v. Seng*, 2008-Ohio-6758, ¶ 21 (12th Dist.).

{¶ 55} An appellate court reviews a domestic relation court's decision involving

- 13 -

shared parenting for an abuse of discretion. *Bowling v. Bowling*, 2021-Ohio-1857, ¶ 30 (12th Dist.). An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *In re B.K.*, 2011-Ohio-4470, ¶ 12 (12th Dist.), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**B. Analysis**

{¶ 56} After a thorough review of the record, we do not find that the trial court's decision designating Springboro City Schools as the children's school district was unreasonable, arbitrary, or unconscionable. The domestic relations court issued a 31-page decision, 22 pages of which were dedicated to an extensive examination of the factual background of the dispute, the parties' various positions on the issues, and the ultimate decision of the trial court. The remaining portion of the decision detailed the court's decision on how the parties would manage shared parenting.

{¶ 57} In her brief, Mother describes the decision in a summary fashion and does not specifically challenge the rationale set forth by the trial court in choosing Springboro, Ohio, or the GAL's recommendation. Instead, Mother's arguments are in the nature of asking this court to reweigh the best interest factors in favor of designating Chicago as the children's school district and residence.

{¶ 58} The domestic relations court's decision reflects a thorough and conscientious examination of what was clearly a difficult issue. The court acknowledged that the children were doing well in Chicago. But ultimately, the court found significant that the children had been raised with Father and Mother in Ohio and Mother made a unilateral decision to move the children to Chicago without Father's knowledge or permission. The court also recognized the financial challenge that would occur if Mother returned to Ohio. Therefore, the court ordered financial assistance from Father if Mother chose to return to Ohio.

{¶ 59} The evidence was clear that the children did not need to be moved to Chicago based on any concern for their safety. Mother agreed that Father never physically harmed her or the children and that Father loved the children and was a good parent. Nevertheless, she claimed that she filed the now-dismissed protection order in Chicago "for my safety and the kids."

{¶ 60} It appears that Mother's decision to file for the civil protection order in Chicago was driven by her annoyance with Father's behavior, her own personal preference to leave Ohio (for various reasons), and her desire to keep the children while living in Chicago. During the final hearing, Mother explained that her motivation was to find her "happy place." However, Mother's mere desire to live in a different city does not outweigh the children's best interest or Father's interest in being close to his children. And while we understand Mother's desire to remain close to her children, Mother is not the only parent and Father's wishes and the children's best interest had to be considered as well.

{¶ 61} Mother takes issue with the court stating at the end of the final hearing that it would not have allowed Mother to move to Chicago. She claims that this remark was the motivating factor in the court ordering the children to return to Ohio and the court did not want to set a negative precedent with regard to parents who decide to leave the state with their children prior to involving the court system. We have reviewed the record and the comments by the judge, and we disagree this was the primary factor.

{¶ 62} As extensively set forth in the decision, the domestic relations court considered all relevant factors in assessing the children's best interest and whether shared parenting was in the children's best interest. Among those factors considered was the GAL's recommendation that the children return to Ohio. The comments by the judge were directed to a hypothetical scenario where Mother, instead of leaving with the children

to Chicago, requested a protection order in Ohio. The judge hypothesized that the court would have granted that order ex parte and further would have granted Mother exclusive rights to the marital residence but that the court would not have permitted Mother to take the children to Chicago. This is a fair statement as the court would not have, at that time, known whether relocation was in the children's best interest.

{¶ 63} The record reflects that the decision to order the children to return to Ohio was in the children's best interest. The children had resided in Ohio for as long as they had been alive, until Mother unilaterally moved them to Chicago. Father's family lived in Ohio and the children had many cousins of a similar age in Ohio. Father was providing financial support for the family and Mother was doing an excellent job of taking care of the children while in Ohio. All the evidence indicated that the parties would engage well under a shared-parenting plan and that this plan would work best and be easiest on the children if Mother chose to live close to the children in Ohio. While the children were also doing fine in Chicago—and the domestic relations court recognized this—their placement there was entirely based on Mother's decision.

{¶ 64} Mother argues that the court ignored that she had the children placed in a free daycare in Chicago and that she would have to pay for daycare in Ohio. However, the court's decision noted that Father had located three daycares in the Springboro area all of which accepted federally funded assistance—that is, the same assistance Mother was using to obtain free childcare in Chicago.

{¶ 65} Mother also contends that the court ignored her belief that she could not find a job paying her $50,000 a year in Ohio. But the court's decision noted that Father had identified several open positions in the Springboro area where Mother could work and earn a similar income.

{¶ 66} Mother cites a case from this court, *Williams v. Mabra*, 2006-Ohio-5845

(12th Dist.), that she argues supports her position that it was in the best interest of the children to remain with her in Chicago. In *Williams*, this court reviewed the decision of a juvenile court which granted a mother's request to relocate with her child to Florida. Mother argues that *Williams* supports her appeal because the juvenile court found that the mother in that case had made the decision to relocate to better the lives of herself, her new husband, and her children. *Id*. at ¶ 18. Mother asserts that she, like the mother in *Williams*, moved to Chicago to better her own life as well as her children's lives.

{¶ 67} Initially, we note that *Williams* involved a mother who petitioned the juvenile court for permission to relocate *after* the parties had entered into a parenting and visitation arrangement. *Id*. at ¶ 4-5. Therefore, the issue was decided pursuant to R.C. 3109.051(G)(1), which governs modification of visitation rights upon the residential parent's relocation. In our case, Mother never moved the domestic relations court to relocate the children and instead did that herself without court intervention. Regardless, we held that the juvenile court in *Williams* properly considered the best interest factors in approving that relocation under the specific facts of that case. *Id*. at ¶ 19. In our case, the domestic relations court also properly considered the best interest factors in determining that the children's best interests were served by placing their residence in the Springboro City School District. That is, in both cases, the courts properly considered the relevant best interest factors. We do not find that *Williams* establishes that the domestic relations court abused its discretion in arriving at its decision in this case.

### III. Conclusion

{¶ 68} The domestic relations court was faced with a difficult decision. Ultimately, the court found that based upon all the evidence presented, the children would be better served by living in Ohio. And the court ordered additional financial terms that would allow Mother to relocate to Ohio if she chose to be close to the children. The record supports

the domestic relations court's finding that it was in the children's best interest to return to Ohio. The domestic relations court enjoys broad discretion in decisions affecting parental rights and responsibilities and we cannot find that the court's decision rose to the level of an abuse of discretion. *Bowling*, 2021-Ohio-1857 at ¶ 30. For these reasons, we overrule Mother's sole assignment of error.

**{¶ 69}** Judgment affirmed.

S. POWELL, P.J., and PIPER, J., concur.